IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

 Plaintiff,

v.

HARRY RAYTON, III,

 Defendant.

Case No. 5:21-cr-40004-HLT-1

## MEMORANDUM AND ORDER

 Defendant Harry Rayton, III, is charged with possession of a firearm by a prohibited person. He moves to suppress the firearm and ammunition found during the traffic stop of the car he was driving along with statements he made while in custody. Docs. 20 and 25. He argues that the police violated the Fourth Amendment because they lacked probable cause: (1) to search the car and seize a firearm and ammunition found inside, and (2) to seize a bullet found in his pocket during a search incident to an arrest. Additionally, he argues that statements he made were either the product of an un-*Mirandized*, custodial interrogation in violation of the Fifth Amendment or were otherwise tainted by that violation. For the reasons stated below, the Court excludes one statement made in response to an officer's question but otherwise denies Defendant's motion.

**I. BACKGROUND**[1]

 On October 2, 2020, Officer Tyler Wohler worked for the Topeka Police Department ("TPD"). He was on patrol at around 10 p.m. in Topeka, Kansas, and noticed a vehicle driving

---

[1] During hearings held on August 12, 19, and 27, 2021, the Court heard testimony from Topeka Police Department Officers Abraham Gaertner, Officer Tyler Wohler, ATF Task Force Agent Gerilynn Wheeles, Samantha Rayton, and Defendant. Based on the officers' demeanor and attentiveness during questioning—and given that, at times, they conceded facts not helpful to the government's case—the Court credits their testimony in its entirety. But the Court relays only those portions of their testimony relevant to its resolution of the motion. The Court credits the testimony of Samantha Rayton and Defendant to the extent discussed below.

south in the 1200 block of Fillmore. He ran the registration, which came back expired, so he conducted a traffic stop. The car was a black and silver Honda Civic that was missing paint. It was registered to Eulogia Arreola.

The car did not immediately stop but continued to an alley. It stopped in a parking lot of a business. As Officer Wohler got out of his car, Defendant (the driver) stuck his head out of the window and told Officer Wohler that the emergency flashing lights would cause the passenger to have a seizure. Officer Wohler deactivated the lights on his patrol car so that they only flashed to the rear of the car.

Officer Wohler then approached the passenger side of the stopped vehicle. Because the window did not roll down, Officer Wohler asked the passenger to open the door, which she did. When the door was opened, Officer Wohler observed an open bottle of alcohol on the passenger side that would have been accessible to the driver. Defendant didn't have any identification on him but identified himself. The passenger then started having a seizure.

Defendant asked if he could come help the passenger, and Officer Wohler said yes. Defendant and Officer Wohler helped the passenger out of the car, and Officer Wohler then called for medical responders. Medical responders arrived shortly after, and so did Officer Abraham Gaertner.

Officer Gaertner was on patrol that night and heard Officer Wohler initiate the traffic stop in an area Officer Gaertner considered a dangerous area. He considered it dangerous because there were regular shootings in the area, gang markings in the alleys, and regular narcotics activity. When he heard the request for medical responders over the radio, he decided to go assist Officer Wohler.

Officer Gaertner arrived, and Officer Wohler explained what was happening and told Officer Gaertner that the passenger was having a medical seizure. Officer Gaertner had some experience dealing with seizures based on his past work experience at a rehabilitation facility. He has also had experience as a law-enforcement officer with individuals feigning seizures during car stops. Officer Wohler said alcohol was involved, and Officer Gaertner knew that alcohol withdrawal can exacerbate seizures. Officer Gaertner noticed the car was very dirty and the inside door panels were missing. He also saw the open container of alcohol in the car on the passenger side.

After Officer Gaertner and medial responders arrived, Officer Wohler went to his patrol car to run a warrant check on Defendant and the passenger. Both had warrants for their arrest.[2] Defendant had a suspended driver's license, and there was no insurance for the vehicle.

Officer Wohler asked dispatch to run a Triple I criminal-history check for Defendant, and it came back negative. Officer Wohler also tried to look up Defendant's criminal history on the Shawnee County public access website, but the website was not working. However, the next day Officer Wohler was able to confirm that Defendant had a prior felony conviction using the Kansas Department of Corrections website.

While the passenger was being placed in the ambulance, Officer Gaertner spoke with Defendant. Defendant was standing near the Honda Civic and kept putting his hands around his pockets. Officer Gaertner decided to pat him down for officer safety. During the pat-down, Officer Gaertner felt a hard object about an inch long in one of Defendant's pockets. Based on his experience and training, Officer Gaertner thought it was a bullet. He called Officer Wohler over and said he thought he found a bullet. Officer Wohler and Officer Gaertner also spoke about

---

[2] The passenger was ultimately transported to the hospital by ambulance.

Defendant having a misdemeanor warrant. At that time, Officer Wohler placed Defendant in handcuffs. Because Defendant was being arrested for the misdemeanor warrant, policy also required a search incident to an arrest. Officer Wohler placed Defendant under arrest, performed a search incident to that arrest, and found a bullet in Defendant's front pocket.[3]

The bullet was seized pursuant to department policy and placed in Officer Wohler's patrol car. Property seized either goes into evidence until the case is resolved, or it is logged as personal property until the owner comes to retrieve it. Some property can go with an arrested individual to the jail, but the jail does not accept contraband such as weapons or ammunition, and so those items go into property at the police department. The bullet was seized as property.

After Defendant was handcuffed and placed in the patrol car, Officer Wohler and Officer Gaertner began a search of the car because of the open container of alcohol. Officer Wohler testified that where there's one open container in a vehicle, there's often other illegal contraband as well.

The driver's door of the Honda Civic had no interior panels. The sheet metal was exposed, which had several cutout holes. Officer Wohler looked inside one of the holes and saw a firearm. It had a magazine with it that was loaded with several bullets. The bullets were the like the bullet found in Defendant's pocket.

Officer Wohler went back to his patrol car to secure the firearm and when he opened the door, Defendant said, without prompting, "I'm sorry, man." Officer Wohler asked, "What, man?" and Defendant again said, "I'm sorry." Officer Wohler then asked, "Why wouldn't you just be

---

[3] Around the time the bullet was found, but before Defendant was read his *Miranda* rights, the officers asked Defendant if he had any felony convictions, and he indicated he was a prohibited person. The government has agreed not to introduce evidence of this statement and does not rely on it in opposing to the motion to suppress.

honest with me?" Defendant responded, "I just don't like telling on myself. It gets so bad out here."[4]

The owner of the parking lot where the vehicle was parked approached officers and said she wanted the car removed. Officers asked Defendant who he would like to tow the car, and Defendant identified a towing company. Officer Wohler testified he was trying to be helpful to Defendant by giving him the option to have the car towed. But, in retrospect, Officer Wohler realized he should have had the car seized because Defendant had not produced any evidence that he owned the car. There would have been an inventory search had the vehicle been impounded pursuant to TPD policy.

Defendant told officers that the car had been loaned to him by a Hispanic male and that the car was not his. Defendant's cousin testified at the suppression hearing that Defendant obtained the car from someone named Tito. She testified that she was with Defendant when he purchased it from Tito, and that she also had prior contact with Tito, who is a family friend and neighborhood mechanic. She testified she had previously bought a car from Tito and had him fix her car and that Defendant had engaged in the same type of dealings with Tito.

Defendant also testified at the suppression hearing. He testified that he traded Tito a wrecked van for the Honda Civic with hopes that he could sell the catalytic converter on the Honda Civic. But the car ran well so he decided to keep it. Defendant knew Tito because they would swap parts and cars. When he traded the van, Defendant told Tito he didn't want a stolen vehicle and specifically asked for a car that was "not hot." Defendant described the Honda Civic as "beat up

---

[4] Officer Wohler then asked, "Are you allowed to have guns?" Defendant responded, "No, I ain't, man." The government does not intend to offer this last statement at trial. Defendant was subsequently read his *Miranda* rights and made additional statements. The government does not intend to offer any post-*Miranda* statements at trial either. Based on this, and on the government's indication it will not introduce the statements discussed in footnote 3, the only statements at issue are Defendant's two statements that he was sorry and his statement that he doesn't "like telling on [himself]."

5

pretty bad" and said he used a hammer to take out some dents and painted some of the rusted areas. Defendant did not have a bill of sale for the Honda Civic, and Tito did not give Defendant the title, though Defendant testified that Tito "was supposed to get the title from some lady, [but Defendant didn't] know where she was at or nothing." There is no record in the vehicle's registration that Defendant or Tito, whose real name is Manuel Torres, ever lawfully owned the Honda Civic.

Defendant testified he had the Honda Civic for "some months" before the car stop and had been living in it and had possessions in the trunk. After the car was towed, Defendant testified he went and talked to someone at the tow company, but he never retrieved the car. The tow company's records don't show that Defendant ever made a claim for the vehicle.

Officer Wohler secured the firearm and took it to the police department. He testified that he would have seized it and placed it into property for return to the owner had he not seized the firearm based on his suspicion that Defendant was a felon prohibited from possessing it. He said he could not just leave it in a parked car in an alleyway for safety reasons.

## II.     ANALYSIS

Defendant seeks to suppress the firearm and ammunition found during the search of the car, the bullet found during the search of his person, and certain statements he made to the officers. The Court must therefore consider Defendant's standing to make these challenges, the propriety of the search of the car, whether the firearm and ammunition were properly seized from the car and his person, and whether his statements to officers are admissible.

### A.     Standing

A preliminary issue raised by the government in response to the motion to suppress is whether Defendant has standing to object to either the search of the Honda Civic or the seizure of the firearm. Specifically, the government argues Defendant has not pointed to any evidence that

6

he owned the Honda Civic or that he had a property or possessory interest in either the car or the firearm. Doc. 21 at 8-9. The Court also raised this issue with the parties at the hearings on the motion to suppress. In his reply brief, Defendant contends that he told officers he had obtained the vehicle from Tito and had permission to drive it. Doc. 22 at 1. At the hearing, Defendant and his cousin testified that he traded Tito a van for the car.

"The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). Fourth Amendment rights cannot be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Thus, the initial question is whether the defendant has a reasonable expectation of privacy in the place searched. *Byrd*, 138 S. Ct. at 1526. Owning and possessing a car likely creates a reasonable expectation of privacy in it, but "legitimate presence on the premises of the place searched, standing alone, is not enough." *Id.* at 1527. There is no expectation of privacy in a stolen car. *Id.* at 1529.

To have standing to challenge a car search, a defendant has the burden of showing he had a legitimate possessory interest in or lawful control over the vehicle. *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003). A defendant need not produce "legal documentation showing a chain of lawful custody from the registered owner to himself." *Id.* Rather, courts consider: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Id.* (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)).

On the first point, Defendant has not asserted an ownership interest over any of the items seized from the Honda Civic, including the firearm. *See United States v. Ewing*, 2013 WL 4082717, at *3 (D. Kan. 2013). He testified he had possessions in the trunk, but officers did not seize anything from the trunk. And there was no credible evidence presented that Defendant ever tried to recover the car or anything in it. As to the second factor, however, Defendant testified he had the car for "some months" and had been living in it. Thus, although he didn't specifically testify to having an expectation of privacy in the vehicle, this would support a conclusion that he did. These first two factors, therefore, are a wash.

The Court finds the third factor—whether Defendant had a legitimate possessory interest in the car—is dispositive. Where a defendant was the car's driver but not the registered owner, the defendant "at a minimum" must demonstrate that "he gained possession from the owner or someone with authority to grant possession." *Valdez Hocker*, 333 F.3d at 1209 (internal quotation and citation omitted).

Here, Defendant presented evidence that he obtained the Honda Civic in a trade with Tito. But Tito was not the registered owner—Eulogia Arreola was. Thus, Defendant must show that Tito was someone with authority to grant Defendant possession of the car. *See id.* ("Because Hocker declared that he borrowed the car from Savala, who was determined at the hearing not to be the registered owner, to establish that he was in lawful possession of the car, Hocker must advance evidence showing that he reasonably believed that the lender was 'someone with authority to grant possession.'" (internal quotation and citation omitted)).

On this point, there is no evidence that Tito had authority to grant Defendant possession of the car, nor does the Court find it credible that Defendant believed Tito had authority to grant him possession. The car was registered to Eulogia Arreola, not Tito. Defendant was aware Tito didn't

8

have the title to the car, as he was supposed to get it "from some lady." But Tito apparently never did, as Defendant never produced the title of the car or even a bill of sale showing a lawful transfer of ownership. Although legal documentation is not necessarily required, *see id.*, there must be some evidence that Tito had a lawful possessory interest in the vehicle when he gave it to Defendant.

On this point, the only evidence that Tito had authority to grant Defendant possession of the vehicle was that Defendant requested that Tito give him a car that was "not hot." But simply asking for a car that was not stolen does not establish that Tito had authority to give Defendant possession of the Honda Civic, nor does it establish a link between Tito and Arreola, the registered owner. To the contrary, the Court finds that this request calls into serious question whether Tito ever had a legitimate possessory interest in the Honda Civic, and certainly whether Defendant reasonably believed Tito did, especially when Defendant did nothing else to confirm Tito's lawful possession. Thus, Defendant has failed to demonstrate he has standing to object to the search of the Honda Civic. *See United States v. Arango*, 912 F.2d 441, 445-46 (10th Cir. 1990) (finding no standing where the defendant failed to present evidence that the party from whom he had obtained the vehicle lawfully possessed it); *United States v. Betancur*, 24 F.3d 73, 77 (10th Cir. 1994) ("Betancur testified that he did not own the pickup truck and the registration papers indicated it was owned by Nava. While Betancur testified that someone named 'Tio' gave him the pickup truck, there was no evidence presented which would establish ownership in 'Tio' or a linkage between 'Tio' and Nava."); *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009) ("A defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner."); *cf. Valdez Hocker*, 333 F.3d at 1210-11 (finding standing where defendant knew the owner of the vehicle, who was a relative of the person who loaned it to

him, and he had reason to believe that the person who loaned it to him had bought it or was in the process of buying it).[5]

The government also briefly challenges Defendant's standing to contest seizure of the firearm, and Defendant's counsel agreed at the hearing that Defendant must establish standing to challenge the seizure of the firearm. But neither party presents any arguments on this point. Nor did Defendant present any evidence suggesting he had a possessory interest in the firearm or ammunition found in the car that would give him standing to challenge the seizure of those items, which is his burden. The Court thus finds that Defendant likewise cannot challenge the seizure of the firearm and ammunition found in the car. But, regardless, the Court finds that the search of the car and the seizure of the firearm and ammunition were nevertheless valid for the reasons discussed below.

### B. Search of the Car

Even if Defendant had standing to challenge the search of the car, the Court would nevertheless find that the search of the car was justified under the circumstances. Warrantless searches are generally unreasonable under the Fourth Amendment. An exception to that rule is the automobile exception, which permits warrantless searches of vehicles if officers have probable cause to believe the car contains evidence of a crime. *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

The officers both testified that they saw an open container of alcohol on the passenger side of the Honda Civic, which is a violation of state law. *See* K.S.A. § 8-1599(b) (prohibiting

---

[5] The officers' body cameras show Defendant telling officers before he was arrested that his clothes were in the car, but that he was not the only one who drove it, so he didn't know if there were other items in it. After his arrest and after he was given *Miranda* warnings, Defendant told Officer Gaertner that it was still Tito's car. Although the Court does not rely on either of these statements to reach its conclusion, the Court notes that they support the conclusion that Defendant lacks standing to challenge the search of the car.

10

transportation of an open container of alcohol in the passenger compartment of a vehicle). Officer Wohler testified that where there's one open container in a vehicle, there's often other illegal contraband as well. Defendant does not contest that the officers observed in plain view an open container of alcohol in the vehicle. But he argues this did not provide probable cause for the search.

"A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *See Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation, citation, and brackets omitted). The Tenth Circuit has recognized that "if an officer has lawfully observed an object of incriminating character in plain view in a vehicle, that observation, either alone or in combination with additional facts, has been held sufficient to allow the officer to conduct a probable cause search of the vehicle." *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002).

Here, the officers observed in plain view an open container of alcohol. Other courts have held that a lawfully observed open container of alcohol provides probable cause to search a vehicle for additional open containers. *See United States v. Howton*, 260 F. App'x 813, 816-17 (6th Cir. 2008) (finding that knowledge that at least one passenger violated K.S.A. § 8-1599(b) gave officers "probable cause to search for any other similar contraband, i.e., any open containers of alcohol being transported in the vehicle in violation of state law"); *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir.1992) ("Once Trooper Newman discovered that McGuire was transporting open, alcoholic liquor in violation of Illinois law . . . he had probable cause to believe that the car contained additional contraband or evidence."); *United States v. Helton*, 2021 WL 2584428, at *2-3 (D. Kan. 2021) ("The deputies had probable cause to believe that Helton violated Kan. Stat. Ann. § 8-1599 and that justified their continued search of Helton's vehicle."); *see also Ewing*, 2013 WL 4082717, at *5; *but see United States v. Thomas*, 434 F. Supp. 3d 576, 585 (W.D. Ky. 2020)

(rejecting application of a per se rule that observance of an open container gives officers probable cause to search and instead requiring a "case-specific inquiry taking into account the particular circumstances").

Here, in addition to the open container in plain view, the Court notes that the car stop occurred late at night in an area of town known for shootings, gang activity, and narcotics activity. Defendant was acting nervous and had a bullet in his pocket. And the passenger had suffered a seizure, which Officer Gaertner knew from his past work at a rehabilitation facility could be exacerbated by alcohol. Based on these considerations, the Court finds that the officers had probable cause to search the car.[6]

### C.     Seizure of the Firearm and Ammunition Found in the Car

Even if Defendant had standing to challenge the search of the car and the seizure of the firearm and ammunition, the Court would nevertheless find that the seizure of the firearm and ammunition was justified under the circumstances. Defendant objects to the seizure of the firearm because officers had no valid grounds to seize it once they were unable to confirm that Defendant was a prohibited person.[7] Owing to testimony adduced at the suppression hearings, the Court requested additional briefing "to address application of the public-safety doctrine to the seizure of

---

[6]  The parties make arguments about whether a TPD policy would have permitted the Honda Civic to be impounded and whether an inventory search following impound would have inevitably led to the discovery of the firearm and ammunition in the car. Given that the Court has found that Defendant does not have standing to challenge the search of the car, and, even if he did, the warrantless search was valid under the automobile exception once officers observed an open container of alcohol in plain view, the Court does not reach this argument. However, the Court does note that it is undisputed that the car was **not** impounded—it was towed privately by a company of Defendant's choosing—and no inventory search took place. *See United States v. Neugin*, 958 F.3d 924, 935 (10th Cir. 2020) (declining to apply inevitable-discovery doctrine where inevitability is based largely on speculation).

[7]  The Triple I check for felony convictions was—incorrectly—negative, and at the time Officer Wohler was unable to confirm from the Shawnee County website whether Defendant was a felon. Defendant's statements to officers that he was a felon and was not allowed to possess firearms are not considered as justification for seizing the firearm. *See United States v. Chavez*, 985 F.3d 1234, 1245-46 (10th Cir. 2021).

12

the firearm found in the vehicle Defendant was driving." Doc. 34. Both parties submitted additional briefs. Docs. 39, 40.

Under the community-caretaking function, an officer who discovers a weapon in plain view may temporarily seize it if "specific and articulable facts" support a public-safety need. *See Chavez*, 985 F.3d at 1244. This extends to the seizure of weapons from vehicles. *See Cady v. Dombrowski*, 413 U.S. 433, 443, 447-48 (1973) (upholding a warrantless search of a trunk for a firearm, when the vehicle was being towed to a private, unguarded garage lot, out of concern for the safety of the general public who might be endangered if an intruder removed the revolver from the trunk of the vehicle); *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992) (upholding removal of gun and ammunition from defendant's truck to protect the public from the possibility that it would wind up in untrained or malicious hands); *State v. Richardson*, 603 A.2d 378, 378-79 (Vt. 1992) (finding a warrantless seizure of rifle in plain view within a car soon to be towed permissible under *Cady* because "unattended, a rifle poses an unacceptable danger to the public").

In *Chavez*, the Tenth Circuit rejected application of the community-caretaking function to justify the seizure of a firearm from a vehicle because the vehicle was parked on a secluded driveway just outside the home of the vehicle's owner, and the owner was present and had claimed the vehicle. *Chavez*, 985 F.3d at 1245 ("Common sense tells us that it would take a daring child, vandal, or thief to walk out in the open that distance to a car parked just outside a home to start snooping and burgling. We have found no case applying the community-caretaking doctrine in such a circumstance."). By contrast, in *Lugo*, the Tenth Circuit concluded that removing a gun left in a truck parked at a gas station with the station's permission was a valid community-caretaking function. *Lugo*, 978 F.2d at 633-36.

Here, Officer Wohler testified that he still would have seized he firearm and ammunition out of concern for public safety even if he lacked probable cause to seize them as evidence of a crime. Officers seized the firearm and ammunition when the Honda Civic was parked in a private parking spot and the owner of the parking spot did not want it left there. It was late at night, and the Honda Civic was in an area known for criminal activities. Officers called the private tow company that Defendant requested, though there was no evidence that Defendant owned the car or could claim it. Nor were officers able to contact the legal owner. The car was also in rough shape, and the firearm had been quickly found in a hole in the driver's side door, which had no interior panel. *Compare id.* ("Furthermore, there is no testimony . . . that the interior door panel of a truck, in these circumstances, was a likely place for a suspected weapon or a place vulnerable to vandals in that area . . . .").[8] Defendant was going to jail, and the passenger was going to the hospital.

The Court finds that these specific facts justify the seizure of the firearm and ammunition found in the Honda Civic as a matter of public safety under the community-caretaking doctrine.

### D. Seizure of the Bullet Found in Defendant's Pocket

In a supplemental motion to suppress, Defendant argues that the officers lacked probable cause to seize the bullet found in his pocket.[9] *See* Doc. 25. Defendant argues that the bullet in his pocket was seized only because Defendant indicated he had a felony conviction and that the bullet should have been returned to him as soon as officers were unable to confirm that he was a prohibited person.

---

[8] *Lugo* involved both the removal of a gun and ammunition for public safety reasons, which was valid, but then an additional search inside the vehicle's door panel, which was not. *Lugo*, 978 F.2d at 636.

[9] To the extent Defendant challenges seizure of the ammunition found in the car with the firearm, the Court addresses that seizure in the context of the seizure of the firearm, discussed above.

But this overlooks key facts. Officer Gaertner initiated a pat-down of Defendant for officer safety and felt what he suspected was a bullet. Shortly thereafter, having discovered Defendant's arrest warrant, Officer Wohler placed Defendant under arrest and performed a search incident to that arrest, where the bullet was found. The bullet was then seized pursuant to policy because Defendant was going to jail, and the jail (quite reasonably) does not permit inmates to have ammunition. *See United States v. Shelton*, 742 F. Supp. 1491, 1497 (D. Wyo. 1990) ("Although the Court does not decide the issue, the seizure of keys could, as conceded by the defendant, be valid for the purpose of an inventory of the arrestee's possessions.").

Defendant does not argue that his arrest was improper or that the search incident to his arrest was improper. *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) (noting that a search incident to an arrest is proper if "a legitimate basis for the arrest existed before the search," and "the arrest followed shortly after the search"); *United States v. Lasley*, 412 F. App'x 177, 180 (10th Cir. 2011) ("The Court has also indicated that the permissible scope of a search incident to arrest is not necessarily defined by the existence or absence of evidence of the particular crime for which the arrest is made."). He was arrested based on an outstanding warrant and was searched almost immediately after officers discovered the warrant. Although Defendant contends there was no basis for officers to seize the bullet based on his status as a prohibited person, he does not argue that it was improper for officers to seize the bullet given his arrest. Nor would such an argument be persuasive.

Accordingly, Defendant's supplemental motion to suppress regarding seizure of the bullet found in his pocket is denied.

### E. Statements to Officers

The final issue is whether Defendant's statements to officers are admissible. Defendant had several conversations with officers both before and after he was arrested, and before and after he was read his *Miranda* rights. The government has agreed to not introduce all but three of these statements.[10] *See* Doc. 21 at 22, 27.

Remaining at issue are three statements made by Defendant after he was arrested but before he was read his *Miranda* rights. These statements were made shortly after officers found the firearm in the car. At the time, Defendant was under arrest and sitting in Officer Wohler's patrol car. When Officer Wohler went to his patrol car to secure the firearm, the following exchange occurred, without any prompting from Officer Wohler or Officer Gaertner:

> Defendant: I'm sorry, man.
>
> Officer Wohler: What, man?
>
> Defendant: I'm sorry.
>
> Officer Wohler: Why wouldn't you just be honest with me?
>
> Defendant: I just don't like telling on myself. It gets so bad out here.

The government contends these three statements by Defendant were unsolicited admissions and are admissible, and they are not rendered inadmissible by any prior *Miranda* violation. Defendant acknowledges that the statements that he was sorry were unsolicited, but he argues that the statement in response to Officer Wohler's question ("I just don't like telling on myself. It gets so bad out here.") was the result of a question designed to elicit incriminating information about Defendant. Doc. 22 at 4.

---

[10] As noted above, the government also refrained from introducing these statements at the suppression hearing. *See Chavez*, 985 F.3d at 1245-46.

Under the Fifth Amendment, individuals cannot be compelled to incriminate themselves. *United States v. Sims*, 423 F. Supp. 3d 1156, 1161 (D. Kan. 2019). *Miranda v. Arizona* established procedural safeguards that must be satisfied before a custodial interrogation. 384 U.S. 436, 444-45 (1966). In the absence of these procedural safeguards, statements given during a custodial interrogation are generally suppressed. *Sims*, 423 F. Supp. 3d at 1161.

An interrogation occurs whenever a person in custody is subject to express questioning or its "functional equivalent" (i.e., words or actions that police should know are reasonably likely to elicit inculpatory statements). *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).[11] Accordingly, "[e]ven if a *Miranda* warning has not been given, spontaneous statements made by a suspect that are not in response to any interrogation are admissible." *United States v. Banegas*, 2021 WL 1316007, at *4 (N.D. Okla. 2021); *see also United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) ("The unwarned confession taken in violation of *Miranda* must be suppressed, but it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well.").

Here, there is little dispute between the parties that Defendant's statements of "I'm sorry, man," and "I'm sorry" were unsolicited statements. *See* Doc. 22 at 4 (Defendant's reply conceding these were unsolicited statements). Having reviewed the body camera footage, the Court agrees. Officer Wohler went to his patrol car to secure the firearm, and Defendant, unsolicited, spoke up from the back seat and said he was sorry, and then repeated himself when Officer Wohler asked "What, man?" The first statement was unsolicited, and the second was made only because Officer Wohler did not hear him. *See Sims*, 423 F. Supp. 3d at 1162 (finding no custodial interrogation

---

[11] All the statements at issue came after Officer Wohler placed Defendant under arrest and put him in the patrol car. Thus, neither party disputes that Defendant was in custody at the time of the three statements.

17

where officer did not ask an express question and only followed up on a mumbled response); *see also United States v. Abdulla*, 294 F.3d 830, 835 (7th Cir. 2002) (explaining that "volunteered statements not made in response to any question posed by the agents" would generally be admissible). Neither "I'm sorry" statement was made in response to an "express question that was likely to evoke an incriminating statement . . . or otherwise engage in behavior likely to invite an incriminating response." *See Sims*, 423 F. Supp. 3d at 1162. They were simply volunteered by Defendant when Officer Wohler opened the door to his patrol car to secure the firearm.

Nor is there any indication that the two "I'm sorry" statements were anything other than voluntary. *Pettigrew*, 468 F.3d at 636 (holding that "the admissibility of an unsolicited inculpatory statement, following a voluntary statement made in violation of *Miranda*, turns on whether the inculpatory statement was knowingly and voluntarily made"). Nothing about the circumstances of these statements suggests they were involuntarily made. *See id.* at 637 (noting that voluntariness is based on the totality of the circumstances). Accordingly, Defendant's statements of "I'm sorry, man," and "I'm sorry," are not the result of custodial interrogation and are admissible.

But the Court finds that Defendant's response to Officer Wohler's question, "Why wouldn't you just be honest with me?" was the result of a custodial interrogation. Unlike Defendant's spontaneous apologies, this was a direct question intended to elicit an admission about the firearm found in the car. The body camera footage reflects that officers had earlier asked Defendant if there was a firearm in the Honda Civic after they found the bullet in Defendant's pocket, which Defendant denied. Given this context, the question "Why wouldn't you just be honest with me?" clearly refers to the earlier questioning about the presence of a firearm and was intended to elicit an incriminating statement from Defendant about his knowledge of the same.

18

Accordingly, this statement is inadmissible because it was the result of custodial interrogation without the procedural safeguards of *Miranda*. *See Sims*, 423 F. Supp. 3d at 1161-62.

## III. CONCLUSION

The Court concludes that Defendant lacks standing to challenge the search of the car because he has not shown a legitimate possessory interest in or lawful control over the Honda Civic and fails to show standing to challenge the seizure of the firearm or ammunition found inside. Even if he did have standing, the search of the car was reasonable under the circumstances. Likewise, the seizure of the firearm and ammunition from the car was done for valid public-safety reasons, and the seizure of the bullet from Defendant's pocket was reasonable given that Defendant was under arrest and the jail would not accept ammunition. Finally, Defendant's statements "I'm sorry, man," and "I'm sorry," are admissible, but his statement "I just don't like telling on myself. It gets so bad out here," is inadmissible.

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress (Doc. 20) is GRANTED IN PART AND DENIED IN PART. The motion is granted to the extent Defendant seeks to exclude his statement, "I just don't like telling on myself. It gets so bad out here." The motion is denied as to Defendant's two "I'm sorry" statements.[12] The rest of his motion is also denied.

THE COURT FURTHER ORDERS that Defendant's Supplemental Motion to Suppress (Doc. 25) regarding seizure of the bullet found in Defendant's pocket is DENIED.

IT IS SO ORDERED.

Dated: October 14, 2021    /s/ *Holly L. Teeter*
                           HOLLY L. TEETER
                           UNITED STATES DISTRICT JUDGE

---

[12] To the extent the government has stated it does not intend to introduce any other of Defendant's pre-*Miranda* or post-*Miranda* statements other than "I'm sorry, man," and "I'm sorry," the motion is denied as moot.